A. W. SHUCK, Appellee, v. FRANK CONWAY et al., Appellants.

**BROKERS:** Purchaser on Contract Terms. Record reviewed, and held wholly insufficient to justify the court in directing a verdict for plaintiff, on the theory that plaintiff had procured a purchaser in accordance with his contract with defendant.

*Appeal from Adair District Court.*—H. S. DUGAN, Judge.

OCTOBER 26, 1920.

ACTION to recover for a commission for the sale of real estate. Trial to a jury, and, at the close of the testimony, the court sustained plaintiff's motion for a directed verdict against two of the defendants, Frank and Ernest, and dismissed the petition as to Faye Conway, on the ground that as to her no agency was proven, and that the evidence does

not show that either of appellants had any authority to make a contract for Faye. Judgment was entered against said two defendants for $480, with interest from August 14, 1919, and costs. The two defendants appeal.—*Reversed and remanded.*

*Carl P. Knox,* for appellants.

*A. M. Fagan,* for appellee.

PRESTON, J.—160 acres of the 240 in controversy belonged to the two appellants, and the other 80 to their sister Faye. There was no sale of the land. The defendants would not sell unless $44,000, or at least $11,000, as they seemed later to be willing to take, was paid down, and the purchaser alleged to have been produced by plaintiff refused to pay either of these amounts.

The petition alleges that, in July, 1919, defendants listed with the plaintiff for sale the 240 acres described, at $225 per acre, upon the following terms: All cash March 1, 1920, except $10,000, which amount was to be carried by them for 10 years from March 1, 1920, upon a mortgage on the 80 acres, and to draw 5½ per cent interest; that the defendants agreed to pay plaintiff the sum of $2.00 per acre, or $480, if he would find them a purchaser for said farm at the above price; that, thereafter, and in July, 1919, plaintiff found a purchaser able, ready, and willing to purchase said real estate at the price and on the terms listed; that defendants refused to enter into a contract with the purchaser, Kromri. By an amendment to the petition, plaintiff alleged:

"Plaintiff alleges that the real estate described in his original petition was listed with him for sale, as therein described, and that he procured a purchaser in the person of one August Kromri, who was able, ready, and willing to purchase the real estate upon the terms therein specified, and offered to purchase the same at the price therein listed, and further offered to pay the sum of $5,000 down,

upon the execution of the contract, and the balance of the same on the first day. of the next March, which. payment was more than the customary and usual payment ordinarily and usually paid upon farms of this size and of this price in said community; and that the ordinary and customary time of the payment of the balance on the sale of farms in this community is upon the first day of March following the sale; and that the plaintiff has complied with all respects in regard to the payments of procuring a purchaser upon the ordinary and customary terms of payment in said community."

The answer of defendants denied generally, but admits that defendant Ernest listed with the plaintiff the real estate described, at $225 per acre, upon the following terms: Cash $44,000, to be paid at such times and on such terms as might be agreeable to him, and the balance to run for 10 years, to be secured by a mortgage on part of the said land. The plaintiff's testimony does not correspond with the allegations of the petition as to what the contract was. He says that he is a rural mail carrier, and is acquainted with the defendants and their land.

"One day when it was raining, I stopped at their place for dinner, and told them I was selling some real estate, and that I believed I could sell their place, if they would list it with me, and I tried to get them to list their farm at $210 an acre, and they said that they would list it for $225 an acre, and, if I got them a buyer for their place at $225 an acre, they would give me $2.00 an acre. That is all the conversation I remember having at that time. Afterwards, I tried to sell the place, and the purchaser asked me what the terms were on the place, and I told him I guessed I had forgot part of my business; so, the next time I met the defendant Ern and his sister, and they talked it over, and I asked them what the terms on the place were, and I told them I could not very well sell the place without terms, and Ernest· said he would talk it over with his brother, and let me know the next day. The next day, I talked the matter over with Ernest and Faye Conway, and

they said they would have to have cash for the quarter section, and also cash for the 80 acres, with the exception of $10,000, which they would carry for 10 years, at 5½ per cent interest—that is all the terms they gave me, and all I asked them."

He says that, soon after, he took defendant Ernest to Mr. Kromri, and Ernest asked Mr. Kromri if Mr. Shuck had told him the terms, and he (Kromri) says, "Yes, sir, he [Shuck] says, cash $44,000, on the first of March, and leave $10,000 on the 80;" and Mr. Kromri says, "Where shall we go to make out the papers?" and Ernest said, "Most any place," and then Ernest asked Kromri if Shuck had told him they wanted $11,000 down on the contract, and Kromri said, "No." Then plaintiff said, "Why, Ernest, you are surely not standing there wanting $11,000 on the contract;" and Ernest said, "Yes," he wanted $11,000 on the contract; and then plaintiff said this was unreasonable.

It will be observed that defendant Ernest did not say that was the contract, nor did he assent thereto; for he at once mentioned the $11,000. It appears that the three then discussed the matter, and there were some negotiations by which plaintiff was trying to induce Ernest to accept a smaller down payment; but the evidence does not show that Ernest or any of the defendants at any time consented to take less than $11,000 down. We do not understand the evidence to show, as contended by appellee in argument, that the defendants, or any of them, agreed to abide or be bound by what Mr. Rutt would say was a reasonable down payment. Even the testimony leaves it indefinite as to what he would consider a reasonable payment. He gives different amounts, and makes it depend on other circumstances, such as the standing of the purchaser, and other things, and finally says it would depend upon what the contract was. When plaintiff said that defendant's terms of $11,000 down were unreasonable, plaintiff said Kromri would give $2,000 down, and Kromri said he would, and then plaintiff said Kromri would pay $5,000 down on the contract, and Mr. Kromri said he would do that; but, as

said, defendants at no time agreed to take less than $11,000 down. Plaintiff says he told Ernest that the interest on $11,000 would amount to $500 until March 1st, and that the buyer had no equity in the place, and that $11,000 was unreasonable; and Ernest said he did not think it was. Plaintiff testifies further that Mr. Rutt said, in the presence of Ernest, that $1,000 on a quarter on a contract to a responsible man was perfectly safe, and $2,000 down was perfectly safe; but that Mr. Rutt said, "It is owing to how you make out the contract," etc.; that, after the conversation, Ernest said, "I am going to stick for the $11,000," and then plaintiff said to Ernest:

" 'It is immaterial to me, if you think your land is worth $250 an acre. All I am working for is the commission, and if you want to raise the land to $250 an acre, and stick for the $11,000, that is your business. All I care for is the commission.' Ernest said that they were figuring on buying, if they sold, and that they would have to pay $15,000 down on their contract on the land they were wanting to buy, which was the reason he wanted so much down on the deal with Kromri. We were trying to convince Conway that the amount he was asking down was unreasonable. The reason I tried to talk Ern out of the $11,000 was, I was satisfied it would knock me out of the sale of the land, if Mr. Conway didn't take a reasonable amount on the contract. The purpose of the visit to Rutt with Ern was to convince him that he was asking an unreasonable amount in cash."

Afterwards, plaintiff says he talked with defendants as to whether they were going to pay the commission, and they said they thought they did not owe any commission: that they claimed the right to name the amount paid down on the contract. At the very last of plaintiff's testimony, on recross-examination, and after he had been recalled, he does say:

"Q. Let us see what your claim is, whether you had authority to sell that land at $225, either with the customary amount down in cash or $11,000 down in cash, or all

of it in cash. A. The terms that Mr. Conway gave me was $225 an acre for the land. I was to sell it for cash, except $10,000 which was to be carried back in the 80 acres, payable the first of March. Q. Who said, payable the first of March? A. The boys." .

The latter part of his first answer is in the nature of a conclusion, without stating what was said, as he had before stated. But he also said:

"Q. Now did they, or either or any of them, at any time up to the time and after the time that Mr. Kromri had said that he would take it, had they ever, at any time, asked the payment of any amount on the contract? A. No, they did not say anything to me at all, never mentioned any kind of terms, except the ones they gave me in the first place."

And he had already testified in chief, and in the fore part of his testimony, as to all that was said, and as we have before set it out. It seems that, during later negotiations, Kromri was willing to pay $44,000 March 1st, and give a $10,000 mortgage; but under no version of the testimony of any of the witnesses, much less the testimony of plaintiff, can it be claimed that that was the contract made between plaintiff and defendants, or the terms upon which plaintiff was to procure a purchaser, in order to earn his commission. Plaintiff seems to now claim that such was the contract, but plaintiff's own evidence does not so show. It is admitted that Kromri was financially able to meet an obligation of $44,000 on March 1, 1920. Mr. Rutt gives the conversation between plaintiff and Ernest substantially as before set out in the testimony of plaintiff. The testimony of Kromri need not be further referred to. It is similar to that before set out in plaintiff's evidence, in so far as it pertains to him. Ernest Conway says that they never listed the land with Shuck with the agreement that he could sell it without the payment of any money down; that he told Kromri, when he asked for the terms, that they wanted $11,000 down on the contract, and that his sister would leave $10,000 in the 80. Kromri did not say very

much about the payment of the $11,000, but Shuck said considerable: said it was too much; that, the only land they had ever bought, they had to pay more than 10 per cent down, and that there was so much land changing hands, he thought 10 per cent was not enough to make things safe; that land was going up, and there were many deals coming off in the spring, and someone would be short of money: and Shuck said he was unreasonable in asking that amount down. Doesn't think he would make a deal for the first of March, if he could do it at any other time, because it is too hard to borrow money then; says he never made deals, and did not know that it was customary to make the transfer of possession March 1st; thinks more are given the first of March than at other times; says that, in listing the land with Mr. Shuck, there was nothing said about the cash payment, at the time the contract was made; nothing said about that. Frank Conway says he never listed the 240 acres or any part of it with Shuck; knew it was listed through his brother, but didn't know how until afterwards; considers anything that was done by his brother would be binding on him, but as to whether it would be binding on his sister, did not know; never gave his consent for his brother to list the land and sell it without the payment of any money down on the contract. At the close of the testimony, plaintiff filed his motion for a directed verdict, as follows:

"1. That the undisputed evidence herein shows that the listing of this farm in controversy by the defendant with the plaintiff, and the undisputed testimony shows that the plaintiff procured a purchaser able, ready, and willing to purchase the same upon the terms listed.

"2. That the preponderance of the testimony shows that plaintiff has complied with the terms of the listing of the real estate for sale, and has procured a purchaser ready, able, and willing to purchase upon the terms listed; and that a verdict for the defendant in this case would be contrary to the preponderance of the same."

The court stated that he considered the motion good, if

plaintiff's pleadings were in shape, and thereupon, plaintiff amended, setting up the custom, and the motion was sustained. A part of the motion seems to be upon the theory that it was for the court to determine what the preponderance of the evidence shows. We are unable to see any theory of the evidence upon which the court could direct a verdict for the plaintiff. We do not quite understand the theory of the court in directing a verdict for $480, after he had held that there was no evidence of agency to bind the sister as to her 80 acres. This would leave but 160 acres, and, at $2.00 an acre, would not amount to $480.

But aside from all this, plaintiff's own testimony shows, in one place, that there was nothing whatever said, when the property was listed, as to the terms of payment: that is, as to the amount that was to be paid down, or in regard to deferred payments. He concedes that that was a part of his business which he had forgotten. When the contract is silent as to such matters, we understand the rule to be that it means a cash sale. It was so held in *Sanden & Huso v. Ausenhus,* 185 Iowa 389; *Staten v. Hammer,* 121 Iowa 499, 501; *Anderson & Rowley v. Howard,* 173 Iowa 4, 14. There is no pretense in his own evidence or anywhere in the evidence that plaintiff secured a cash purchaser, and the evidence for the defendant shows, without dispute, that there was no agreement to sell the land without any down payment. Defendant's evidence also shows that, at the time the property was listed, and in the contract as originally made, there was nothing said about the terms. Again, it appears from plaintiff's own testimony, before set out, that, when plaintiff asked what the terms were, they told him they would have to have cash for the quarter section and cash for the 80 acres, with the exception of $10,000; and he says, "That is all the terms they gave me." Plaintiff says nothing here about different payments being March 1st, so that, thus far, under plaintiff's own evidence, it was either a cash sale, because the terms were silent, or it was a cash sale by which there was to be a payment of $44,000 down, and a mortgage for $10,000 for the balance. Con-

cededly, plaintiff did not find a purchaser on those terms. It appears, then, that defendant was either entitled to all cash, or $44,000 cash. If, as it appears, he was willing to waive either of those amounts down, and accept $11,000 instead, he was within his rights. Concededly, plaintiff did not furnish a buyer who was willing to pay even $11,000 down. Clearly, if defendant was entitled to all cash, or $44,000 in cash, he would be entitled to demand $11,000. Defendant's demand for a payment of $11,000 was in response to plaintiff's question as to what the terms were. Even though defendant might be held bound to accept the $11,000, the most that plaintiff could claim, under the circumstances, would be that the cash payment was to be $11,000, and that such was the contract. This being so, we are unable to see how the question of custom cuts any figure.

Without further discussion, the trial court was not justified, under any theory of the evidence and the pleadings, to direct a verdict for the plaintiff. At the most, it was a question for the jury to say what the contract was, as to the terms and time of payment. It follows that the judgment of the district court must be and it is reversed, and the cause remanded.—*Reversed and remanded.*

WEAVER, C. J., EVANS and SALINGER, JJ., concur.